UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION (DETROIT)

In re:                                          Chapter 7

Patrice Lynnette Harold,                        Case No. 16-40659

        Debtor.                                 Hon. Phillip J. Shefferly
_____/

United States of America,                       Adversary Proceeding
                                                No. 16-5041-PJS
        Plaintiff,

v.

Patrice Lynnette Harold,

        Defendant.
_____/

**OPINION DETERMINING TAX DEBT IS EXCEPTED FROM DISCHARGE**

**Introduction**

        This matter is before the Court following a trial on a complaint to determine

whether a Chapter 7 debtor's tax debt to the IRS is excepted from discharge under

§ 523(a)(1)(C) of the Bankruptcy Code.  For the reasons set forth in this opinion, the

Court holds that the IRS has proven all the elements necessary to except the debt

from discharge under § 523(a)(1)(C).

## Jurisdiction

This is a core proceeding under 28 U.S.C. § 157(b)(2)(I) over which the Court has jurisdiction under 28 USC §§ 1334(a) and 157(a).

## Procedural history

Patrice Lynette Harold ("Debtor") filed a Chapter 7 bankruptcy petition on January 15, 2016 and received a discharge. On November 15, 2016, the Internal Revenue Service ("IRS") initiated this adversary proceeding by filing a three-count complaint seeking to determine that taxes owed by the Debtor for 2004 through 2012 and 2014 are excepted from the Debtor's discharge under § 523(a)(1)(A), (B) and (C) of the Bankruptcy Code.

At the request of the parties, the Court stayed the prosecution of this adversary proceeding because the IRS and the Debtor are also parties to a separate lawsuit ("District Court Lawsuit") in the United States District Court for the Eastern District of Michigan ("District Court"). The IRS filed the District Court Lawsuit to determine the amount of taxes, penalties and interest owed by the Debtor, and to enforce a federal tax lien that it had filed against the Debtor's home to collect that debt. For a time, the IRS and the Debtor thought that the proceeds received by the IRS from enforcement of that lien might be enough to pay all the Debtor's debt to the IRS, which would obviate the need for this Court to determine the

- 2 -

dischargeability of that debt. Eventually, it became apparent to the parties and to this Court that regardless of the outcome of the District Court Lawsuit, there would still be some amount owed by the Debtor to the IRS, and this Court would have to decide whether that amount is nondischargeable. Therefore, the Court terminated the stay so that this adversary proceeding could go forward.

By agreement of the parties, this Court is not asked to determine in this adversary proceeding how much the Debtor owes to the IRS. The parties agree that the amount of the debt will be determined by the District Court in the District Court Lawsuit. This Court is asked in this adversary proceeding only to decide whether the debt owed by the Debtor to the IRS — in whatever amount the District Court determines — is excepted from the Debtor's Chapter 7 discharge.

The Court has already granted the IRS a summary judgment on counts I and II of its complaint, holding that the Debtor's tax debt for 2012 and 2014 is excepted from discharge under § 523(a)(1)(A), and the Debtor's tax debt for 2008 and 2010 is excepted from discharge under § 523(a)(1)(B). That just leaves count III, which requests that the Court except from discharge the Debtor's tax debt for 2004 through 2012 and 2014 under § 523(a)(1)(C).

The Court held a trial on count III over four days, November 6 through 8, and November 13, 2019. Prior to the trial, on the stipulation of the parties, the Court

signed a Joint Final Pretrial Order ("Pretrial Order") that contains 50 stipulations of fact. At the trial, the IRS called three witnesses: the Debtor, the Debtor's husband, Thomas Barrow ("Barrow"), and an IRS revenue officer, Christopher Smith ("Smith"). The Debtor called three witnesses: the Debtor, Barrow and an accountant, Akono Gross ("Gross"). The Court admitted into evidence exhibits 1 through 34, 38 through 45, 60 through 63, 77, 79, 84 through 87, 91 and 93. The IRS and the Debtor have fully briefed all issues and the matter is now ready for decision.

## Findings of Fact

The Court finds the following facts from the testimony at trial, the exhibits admitted at trial, and the stipulation of facts in the Pretrial Order.

The Debtor is a practicing doctor who specializes in obstetrics and gynecology. She enjoys a successful and busy practice, and works long hours.

In 1993, the Debtor married Barrow. At that time, Barrow was a certified public accountant. However, he later lost his license after he was convicted in 1994 of filing a false statement in connection with a bank loan application, bank fraud, tax evasion and filing a false tax return. The conduct that was the subject of the conviction occurred in the 1980's, prior to when Barrow married the Debtor. No

longer practicing as an accountant, Barrow now owns Fidelity Refund Services ("Fidelity"), a consulting firm.

The Debtor and Barrow have two children together, one daughter and one son. The Debtor is the primary source of income for the family.

From February, 2000 until she filed her Chapter 7 case, the Debtor conducted her medical practice through Patrice L. Harold, M.D., PLC ("Harold PLC"), a professional liability company in which the Debtor was the sole member. Shortly after its formation, Harold PLC became one of the two members of a professional limited liability company known as Harold Hinton Physicians for Womens Health, PLLC. In December, 2010, that entity changed its name to Southfield OB/GYN Associates, PLLC ("Southfield OBGYN"). From then until sometime after the Debtor filed her Chapter 7 case, Southfield OBGYN received revenues both from the Debtor's medical practice at Harold PLC and from the medical practice of Dr. Michele Thomas ("Thomas"), whose own professional liability company is the other member of Southfield OBGYN. Throughout all this time, Southfield OBGYN paid the rent, payroll, and other common expenses both for Harold PLC and for Thomas's professional liability company.

Although Harold does not have a financial background, she had check signing authority for Harold PLC and for Southfield OBGYN throughout the years that are

the subject of this adversary proceeding and wrote checks for both entities throughout that time. She also regularly reconciled the bank accounts for both entities. Harold is also identified as the "tax matters partner" on the federal income tax returns for Southfield OBGYN.

At all times during their marriage, Barrow has handled all the Debtor's tax matters. The Debtor and Barrow filed joint tax returns for the years 2004 through 2014, which Barrow prepared from information that Harold provided him and from QuickBooks reports for Harold PLC. After preparing each return, Barrow would discuss the return with Harold and give her the return to sign. Sometimes Harold reviewed the return before signing, other times not. Harold trusted Barrow to handle the tax returns because of his accounting and financial background.

During these years, it was not uncommon for Barrow to request an extension of time to file a return. For example, the 2004 return (ex. 14) was not received by the IRS until October 31, 2006, and the 2005 return (ex. 15) was not received by the IRS until December 11, 2006. During other years, returns were not filed timely. In granting a partial summary judgment for the IRS earlier in this adversary proceeding, the Court found that the returns that Barrow prepared for 2008 (ex. 18) and 2010 (ex. 20) were not filed until January, 2016.

- 6 -

The returns for the Debtor and Barrow for the years 2004 through 2012 and 2014 (exs. 14-23) show that the Debtor's medical practice was lucrative. Harold PLC's gross revenues during those years averaged over a half million dollars annually with a low of $423,829.00 in 2004 and a high of $613,125.00 in 2007. The returns for those years show an annual net profit for Harold PLC, ranging from a low of $174,971.00 in 2006 to a high of $364,946.00 in 2008. Even after reducing the net profit by Harold PLC's allocable share of Southfield OBGYN's flow through losses, the returns for those years show that the net income for Harold PLC averaged over $170,000.00 annually. With the exception of the 2004 return, which shows that the Debtor was entitled to a refund of $3,971.00, the returns show a tax liability owed by the Debtor and Barrow for each year in the following amounts: $42,696.00 for 2005; $23,829.00 for 2006; $28,298.00 for 2007; $28,768.00 for 2008; $22,187.00 for 2009; $15,704.00 for 2010; $25,759.00 for 2011; $4,604.00 for 2012; and $5,003.00 for 2014.

In March, 2009, knowing that they were behind in their taxes, the Debtor and Barrow engaged Lothamer Tax Resolution, Inc. ("Lothamer") to negotiate an installment agreement with the IRS for their tax debts for the years 2003 through 2007. Barrow and the Debtor each signed a power of attorney authorizing Lothamer to represent them with the IRS. Gross, a certified public accountant at Lothamer,

was assigned to their file. Barrow handled all the communications with Gross. Gross did not meet or speak with the Debtor.

On July 6, 2009, Gross sent the IRS a proposed installment payment agreement (ex. 38). It covered tax years 2003 through 2008 and provided for payments of $1,000.00 per month that would increase to $5,000.00 per month beginning in July, 2010. On July 10, 2009, the IRS wrote a letter (ex. 39) to the Debtor and Barrow to inform them that the IRS approved the installment agreement, but the letter specified that it covered only tax years 2003 through 2007. The Debtor and Barrow did not realize at the time that the IRS approval did not include tax year 2008, as they had proposed. They later learned that the reason why 2008 was not included was because Barrow had requested an extension of time to file the 2008 return and, as of the date of the IRS approval of the installment agreement, the 2008 return had not yet been filed.

The Debtor and Barrow made some payments under the installment agreement, but they soon missed others in 2009 and did not make the "step up" monthly payments as required beginning in July, 2010. Although they maintain that the installment agreement was still in effect when the Debtor filed her Chapter 7 case because they never received a notice of default from the IRS formally terminating

- 8 -

the installment agreement, the Debtor and Barrow admit that they did not make all the payments required by the installment agreement.

The IRS Certificates of Official Record, Form 4340, for the years 2004 through 2007 (exs. 24-27), all of which are years covered by the installment agreement, show an unpaid debt for taxes, penalties or interest for each of those years.

The IRS Certificates of Official Record, Form 4340, for the years 2008 through 2012 and 2014 (exs. 28-33), all of which are years after the installment agreement, show that the Debtor and Barrow did not pay all their taxes, penalties and interest for those years either.

Although conceding that they still owe something to the IRS for the years 2004 through 2012 and 2014, the Debtor and Barrow dispute the amount claimed by the IRS. In the District Court Lawsuit, the IRS alleges that the Debtor owes more than $400,000.00 of taxes, penalties and interest. In the schedule E/F (ex. 1) that the Debtor filed in her Chapter 7 bankruptcy case, the Debtor lists a total debt of $268,576.67 owing by her to the IRS. The Debtor did not list any of this amount as disputed.

The IRS internal account transcripts for the years 2004 through 2012 and 2014 (exs. 4-13) show that the IRS sent numerous collection notices and notices of intent

to levy both to the Debtor and to Barrow at their residence. According to Smith, the IRS sent 84 collection notices to the Debtor alone. The Debtor generally did not see the notices because Barrow routinely picked up the mail at their home, including all the IRS communications. In part, this was due to the fact that the Debtor worked long hours and frequently did not arrive home until very late. But Barrow also did this because he was the one who handled all the family's tax matters.

Even though the Debtor did not see all the specific notices and Barrow did not share all of them with her, the Debtor does not dispute that she received them. And even though the Debtor did not know the specific amounts that she owed, the Debtor knew throughout these years that she owed delinquent taxes, penalties and interest to the IRS for multiple years and worried about paying them.

While the Debtor and Barrow struggled to deal with their tax problems throughout these years, they still managed to maintain a comfortable, even affluent, lifestyle.

In 1995, the Debtor purchased a home for her family on Newport Street in Detroit. In September, 2004, the Debtor refinanced the home. The refinancing allowed the Debtor to pay off the existing mortgages on the Newport Street home and, according to the closing statement (ex. 86), the Debtor received $36,757.09 in cash at closing.

- 10 -

In 2005, the Debtor and Barrow planned to sell the Newport Street home and move to a more expensive Detroit River waterfront home on Dwight Street. On August 19, 2005, the Debtor entered into a Land Contract ("Drury Land Contract") (ex. 42) with Robert Drury, as Attorney in Fact for Sara Rose, Trustee for the Sara Rose Revocable Trust ("Drury Trust"), to purchase the Dwight Street home for $625,000.00. The Drury Land Contract required the Debtor to pay $30,000.00 down, and monthly payments beginning at $3,000.00 and later increasing to $4,000.00, with the entire balance to be paid off in eight years.

Unfortunately, the Debtor was unable to sell the Newport Street home after entering the Drury Land Contract, so the Debtor was stuck with two monthly house payments: $2,000.00 for Newport Street and $3,000.00 for Dwight Street. The Debtor went on paying for both houses for several years until she could no longer do so and lost the Newport Street home to foreclosure in 2009. Paying two house payments each month caused the Debtor and Barrow to fall further behind on their tax debt to the IRS.

Despite these troubles, the Debtor and Barrow sent their two children to private grade schools and high schools. Both the Debtor and Barrow were raised as Catholics and attended Catholic schools. Because their Catholic faith is important to them, they raised their children in the Catholic faith and sent their children to

Catholic schools. But was expensive (ex. 34). From 2004 to 2012, the Debtor paid a total of $64,247.00 in tuition for her daughter to attend two Catholic schools (St. Clare of Montefalco Catholic School and Mercy Catholic High School). From 2004 to 2017, the Debtor paid a total of $89,474.00 for her son to attend two Catholic schools (St. Clare of Montefalco Catholic School and University of Detroit Jesuit High School).

In addition, the Debtor paid for her two children to attend private colleges. From 2012 to 2016, the Debtor paid a total of $118,390.00 in tuition and room and board for her daughter to attend college at Boston University. From 2008 to 2015, the Debtor paid a total of $53,088.00 in an education plan with Michigan Education Trust for tuition and other expenses for her son to attend college at Loyola University.

Altogether, during the years 2004 through 2017, the Debtor paid a total of $325,199.00 in private school tuition, room and board and related educational expenses for her two children.

Throughout these years, the Debtor and her family lived well in other ways. They took multiple family vacation trips: Mexico in 2004; Alaska in 2007; Puerto Rico in 2008, 2009 and 2013; and Orlando in 2010. The Debtor also took multiple personal trips: Washington D.C. for her college sorority's centennial

anniversary in 2008; Paris in 2010 for her daughter's 16th birthday; Las Vegas in 2011 to run a race; Hawaii in 2015; and Dubai in 2018. In addition, the Debtor took multiple trips with her children to look at different colleges and then to visit her children in college: Rhode Island in 2010; New York in 2012; and Boston in 2014.

The Debtor drove fairly expensive cars too. From 2003 through 2015, the Debtor purchased or leased, either for herself or Barrow, the following vehicles (ex. 34): a Jaguar, a Mercury Mountaineer, two Cadillacs, two Lincolns, a Lexus and a Harley Davidson motorcycle. With the exception of the motorcycle, each of these vehicles required a monthly payment of $600.00 or more, with some nearly $800.00 per month.

The Debtor did not pay for these personal expenses out of her own bank account. From 2004 until she filed her Chapter 7 bankruptcy case, the Debtor paid for all her personal expenses out of two bank accounts in the name of Harold PLC. Most were paid out of Harold PLC's account at Comerica Bank but some were occasionally paid out of Harold PLC's account at Chemical Bank. The Debtor routinely paid mortgage payments, land contract payments, taxes, car payments, credit cards, tuition, personal shopping trips, vacation trips and all her personal expenses out of Harold PLC's Comerica Bank account. The Debtor even wrote a $10,000.00 check (ex. 61) to Fidelity from the Harold PLC Comerica Bank account.

- 13 -

The memo section reads "loan," but the Debtor does not know the purpose of the payment. The Debtor treated all of these personal expenses on Harold PLC's records as part of her "member's draw."

Even though Barrow was not employed by nor had any position with Harold PLC, he too wrote checks on the Harold PLC account at Comerica Bank to pay his and the Debtor's personal expenses. On December 29, 2010, Barrow wrote a check for $2,800.00 (ex. 60) to his own company, Fidelity; on February 17, 2011, Barrow wrote a check for $12,500.00 (ex. 62) to County of Wayne Treasurer; on March 10, 2011, Barrow wrote another check (ex. 63) to Fidelity, this time for $3,000.00; on March 27, 2014, Barrow wrote a check for $1,105.00 (ex. 77) to his daughter's landlord; and on October 16, 2014, Barrow wrote a check for $1,150.00 (ex. 79) to his daughter. These checks were recorded as the Debtor's "member's draw."

The Debtor did make some payments to the IRS during the years after entering into the installment agreement, but not enough either to keep up with her current tax obligations or to keep up with repayment of her delinquent tax obligations under the installment agreement. The IRS continued to send notices to the Debtor and continued to pursue collection actions against her. In late 2015, the Debtor began to consider whether bankruptcy provided her with a way of dealing with her tax debts.

In July, 2016, the Debtor filed her Chapter 7 case, represented by an attorney recommended to the Debtor by Lothamer. The IRS was by far the largest creditor in the case. Despite the fact that the Debtor had to amend her schedules to correct some inaccuracies, and despite the fact that the Debtor had to find a new attorney when her original attorney withdrew, the Debtor succeeded in getting a Chapter 7 discharge.

Throughout the Debtor's bankruptcy case, the Debtor and her family continued to live at the Dwight Street home and the Debtor continued to stay current with payments under the Drury Land Contract — although they were now biweekly payments because of an amendment (ex. 42) to the Drury Land Contract made on October 25, 2013.

After the Debtor obtained her discharge, but while the Chapter 7 case remained open for the Chapter 7 trustee to administer any estate property, the IRS obtained an order from the Court abandoning any interest that the bankruptcy estate had in the Drury Land Contract. That meant that the Debtor no longer had to worry about the Chapter 7 trustee trying to take her home. But it also meant that the automatic stay that came into effect when the Debtor filed Chapter 7 was no longer in effect to stay the IRS from enforcing its lien against the Debtor's home. In January, 2018, the IRS filed the District Court Lawsuit to do just that.

- 15 -

While the District Court Lawsuit was pending, the Debtor and Barrow came up with a plan to keep the IRS from enforcing its lien against the Debtor's home on Dwight Street. The plan had several steps.

In November, 2018, Barrow spoke to Leslie Drury ("Drury"), the successor trustee for the Drury Trust, about the payments under the Drury Land Contract. Barrow explained that cash was "drying up" for the Debtor and Barrow because of the legal fees incurred in litigating with the IRS. Barrow inquired whether the Drury Trust would be "okay with [the Debtor] not paying on the land contract until the IRS issue is cleared up." Drury agreed to "forbear accepting payments" from the Debtor until "the IRS matter" is over.

In December, 2018, Barrow had an inspection performed on the Dwight Street property and obtained a recommendation from a board of realtors for an appraiser who would perform an appraisal of the Dwight Street property that would take into consideration the cost of any repairs to remedy defects that might show up during an inspection. Barrow testified that the appraisal he obtained at that time showed a value of $350,000.00.

Around the same time, Barrow began doing some research about land contract forfeitures and how they might extinguish an IRS lien. Barrow found an article discussing this possibility and sent it to Drury and to David Watts ("Watts"), the

attorney for the Drury Trust. Barrow then drove several hours to Watts' office and showed up without an appointment to explore with Watts how the Debtor might be able to have the Drury Trust declare a default under the Drury Land Contract so that it could then declare a forfeiture, even though the Debtor's payments under the Drury Land Contract were current. Watts immediately rejected the idea of having the Debtor deliberately default under the Drury Land Contract just to trigger a forfeiture that might help the Debtor extinguish the IRS lien on her land contract vendee's interest. Barrow and Watts then spoke about other possible transactions that might help the Debtor keep her land contract vendee's interest in the Dwight Street property and prevent the IRS from taking that interest in the District Court Lawsuit. They came up with an idea: have the Debtor find someone to buy the Dwight Street property, pay off the Drury Land Contract, and then "work out something" to let the Debtor and her family continue to live there.

When he returned home from meeting with Watts, Barrow discussed the idea with the Debtor. The Debtor asked Barrow about having one of the clients of Fidelity — Barrow's company — make the purchase. Several of Barrow's clients came to mind. The Debtor remembered that one of Barrow's clients was Sil Watkins ("Watkins"), an individual who Barrow met years before when they were both in federal prison. Watkins was the managing member of SWEWAT, LLC

("SWEWAT"), a company that buys and sells property. Barrow and the Debtor decided to call Watkins. Barrow made the call and then handed the phone to the Debtor.

The Debtor and Watkins discussed the condition of the Dwight Street home and the need for some repairs, and then discussed the purchase price. Basically, they agreed to have SWEWAT purchase the Dwight Street property for what they considered to be a "fair market value" of $220,000.00. They further agreed that of the proceeds, approximately $172,000.00 — the balance owing on the Drury Land Contract — would be paid to the Drury Trust, with any remaining proceeds to go to the Debtor. Following SWEWAT's purchase, neither the Drury Trust nor the Debtor would have any interest in the Dwight Street property. They agreed that SWEWAT would then rent the Dwight Street property back to the Debtor and Barrow so that they and their family could live there, without the IRS enforcing its lien to take the home away from them. The Debtor, Barrow and SWEWAT planned to have SWEWAT pay off the Drury Land Contract, but the Drury Trust did not respond to their calls. The Debtor and SWEWAT went ahead with the deal anyway.

On March 3, 2019, the Debtor and SWEWAT signed an Agreement to Purchase Interest in Land Contract ("SWEWAT Agreement") (ex. 43). The SWEWAT Agreement states that SWEWAT purchases the Debtor's land contract

vendee's interest in the Dwight Street property for $220,000.00 less "credits" for tax, insurance and $172,408.72 to be paid to the Drury Trust. The SWEWAT Agreement was not recorded with the Wayne County Register of Deeds, although the Debtor later signed a quit claim deed (ex. 44) on May 13, 2019, which was eventually recorded on June 27, 2019.

On the same day that the SWEWAT Agreement was signed, SWEWAT wrote two checks (ex. 43) to the Debtor, totaling $42,937.00. The Debtor paid the proceeds of those checks to the IRS, but did not say anything at the time about the source of these proceeds.

The Debtor did not tell her attorneys, either in the District Court Lawsuit or in this adversary proceeding, about the sale of her home for some time. Nor did she tell the IRS or the District Court. On March 19, 2019, just two weeks after signing the SWEWAT Agreement, the Debtor attended a settlement conference with the IRS in the District Court Lawsuit. The Debtor did not mention the sale. The Debtor did not disclose the fact of the sale either to the IRS or the District Court until sometime in July, 2019 when the Debtor opposed the request of the IRS to appoint a receiver to sell the Dwight Street property by arguing that the IRS's request was moot because the Debtor had sold her interest in the Dwight Street property back in March, 2019.

- 19 -

The Debtor and her family continue today to live in the Dwight Street home. They no longer make any payments to the Drury Trust. They claim that SWEWAT allows them to live there under a rental agreement that Barrow made with SWEWAT for $4,100.00 per month. The Debtor does not make any rent payments but believes that Barrow does, although she does not know the account from which any rent is being paid, and does not have a copy of a lease or proof of any rent payments. The Debtor continues her medical practice and remains the primary source of income for the Debtor's family.

## Discussion

### Applicable law

Section 523(a)(1) excepts three different tax debts from a Chapter 7 discharge. At issue in this case is the exception under § 523(a)(1)(C) for a tax "with respect to which the debtor made a fraudulent return or willfully attempted in any manner to evade or defeat such tax[.]" The IRS does not allege that the Debtor made a fraudulent return but does allege that the Debtor willfully attempted to evade or defeat her taxes for the years 2004 through 2012 and 2014.

The Sixth Circuit Court of Appeals has construed the phrase "willfully attempted to evade or defeat a tax" in several cases. In <u>Toti v. United States</u> (<u>In re Toti</u>), 24 F.3d 806 (6th Cir. 1994), the debtor had failed to file returns and pay taxes

for several years.  The debtor argued that failure to file returns and pay taxes by themselves are not affirmative acts and are therefore not enough to make a tax debt nondischargeable under § 523(a)(1)(C).  The bankruptcy court agreed, but the district court reversed.

In affirming the district court, the Sixth Circuit drew two important conclusions.  First, the term "willfully" in § 523(a)(1)(C) equates to "voluntary, conscious and intentional."  Id. at 809.  Second, § 523(a)(1)(C) "includes both acts of commission and acts of omission."  Id.

The Sixth Circuit next dealt with § 523(a)(1)(C) in Stamper v. United States (In re Gardner), 360 F.3d 551 (6th Cir. 2004).  Unlike the debtor in Toti, the debtor in Gardner had filed all his returns, but he did not pay his taxes.  The debtor negotiated a compromise with the IRS.  However, he failed to disclose to the IRS that he was using nominee bank accounts in someone else's name to conceal substantial amounts of income that he then used to pay for a lavish lifestyle that included numerous golf junkets and vacations.  The bankruptcy court held that the tax debt was nondischargeable.  The district court affirmed.

On appeal to the Sixth Circuit, the debtor in Gardner argued that the holding in Toti did not apply because that case involved an attempt to defeat the *assessment* of a tax, not the *payment* of a tax.  In contrast to the debtor in Toti, the debtor in

- 21 -

Gardner had filed his returns and had not done anything to evade or defeat the assessment of his taxes. The Sixth Circuit rejected the argument, noting that "the court in Toti refused to distinguish between the payment and assessment of a tax liability for purposes of discharge under § 523(a)(1)(C)." Id. at 558. The Gardner court observed that Toti "cast a wide net, concluding that § 523(a)(1)(C) included attempts to thwart payment of taxes." Id. at 557 (citation omitted).

The Gardner court went on to apply a two-part test that had been adopted in other circuits. Section 523(a)(1)(C) has "a conduct requirement and a mental state requirement." Id. at 558 (citing United States v. Fretz (In re Fretz), 244 F.3d 1323, 1327-29 (11th Cir. 2001)).

> The government satisfies the conduct requirement when it proves the debtor engaged in affirmative acts to avoid payment or collection of the taxes. . . . Under the mental state requirement, the government must prove the debtor voluntarily, consciously, and knowingly evaded payments. The mental state requirement is proven when the debtor:
>
> (1)　had a duty to pay taxes;
> (2)　knew he had such a duty; and
> (3)　voluntarily and intentionally violated that duty.

Id. (citations omitted).

The Sixth Circuit again considered § 523(a)(1)(C) in United States v. Storey, 640 F.3d 739 (6th Cir. 2011). The debtor in that case was a practicing doctor who filed tax returns that showed taxable income for the years 1994 through 1997 and

- 22 -

2000 through 2005, but did not pay any federal income taxes for those years. The district court held that the debtor's tax debt was nondischargeable under § 523(a)(1)(C) because the debtor's "pattern of failing to pay income tax over a number of years [was] evidence of a willful attempt to defeat the tax." Id. at 743.

On appeal, the Sixth Circuit reversed, using the two-part test from Gardner to analyze evidence of the debtor's conduct and mental state. The only evidence of conduct was the debtor's failure to pay taxes despite having filed "timely and accurate" returns for the years in question. Id. at 744. "This [was] not enough by itself to render her tax debt nondischargeable [u]nless her non-payment was 'knowing and deliberate[.]'" Id.

The debtor conceded the first two elements of the mental state requirement — that she had a duty to pay taxes and knew she had that duty. Id. at 745. That left only the third element at issue — that she voluntarily and intentionally violated that duty. The IRS argued that the debtor's purchase of real property "the very year she stopped paying taxes [ ] demonstrate[d] a voluntary and intentional choice to evade her tax obligations." Id. The Sixth Circuit disagreed, noting that the property was not extravagant, and there was no evidence that the new property was more lavish than the prior residence. Id. In addition, there was no evidence that the debtor "lived lavishly during the years she did not pay her taxes, or that she chose to engage in

- 23 -

recreational or philanthropic activities instead of paying her taxes." Id. (contrasting Gardner, 360 F.3d at 560-61, with that debtor spending "substantial sums" on golfing and vacations) (other citations omitted).

A bankruptcy court opinion within the Sixth Circuit illustrates the application of the Sixth Circuit's standard for § 523(a)(1)(C). In Volpe v. I.R.S. (In re Volpe), 377 B.R. 579 (Bankr. N.D. Ohio 2007), the debtor was a self-employed real estate agent and broker. After obtaining a Chapter 7 discharge, he filed an adversary proceeding asking that his tax debt for 1997 through 1999 be declared dischargeable. The debtor argued that he did not pay his tax obligations for those years because he was in a long and complex divorce case and all his money was "tied up in the divorce." Id. at 583.

The IRS argued that the debtor's tax debt was nondischargeable for two reasons. First, during his divorce, the debtor arranged to have his mother purchase a home from a family friend for the debtor to live in with his children. Title to the home and the mortgage on the home were placed in the debtor's mother's name. However, the debtor immediately agreed to rent the home from his mother and make monthly rent payments to her in exactly the same amount as the mortgage payment. The debtor also made all the payments for utilities, taxes, insurance and maintenance of the home. The debtor's mother made no payments of any kind on the home and

- 24 -

retained no paperwork regarding it. The debtor testified that he arranged this transaction to keep the home from his wife during his divorce case. Several years after the divorce case and bankruptcy case had ended, the debtor had title to the home placed in his name. Id. at 584-85. The second reason argued by the IRS was that the debtor paid substantial amounts during the years in question for his children to attend private schools and for the debtor and his girlfriend to take multiple vacations to Hawaii, Florida and the Bahamas. Id. at 585.

The Volpe court applied the two-part test of § 523(a)(1)(C) required by the Sixth Circuit. The court found that the IRS proved the conduct element by showing that the debtor filed late returns, and failed to pay taxes while he paid for "non-necessities such as vacations and private schools." Id. at 587. In addition, the court found the conduct element present by the way the debtor structured the purchase of the home by his mother with his mother renting it back to him. "The overwhelming weight of the evidence showed that the transaction . . . was a sham, and that the debtor had an ownership interest in the property." Id. "By putting title to this asset in [his mother's] name, the debtor prevented the IRS from placing a tax levy on the property and selling it to satisfy some of the debtor's tax debt. This is an affirmative act of evasion." Id. at 588.

The Volpe court rejected the debtor's contention that the IRS failed to prove the mental state requirement of § 523(a)(1)(C). Noting that "[t]he IRS is not required to show that the debtor engaged in a fraudulent scheme to prove that he acted willfully," the court explained that arranging the transaction to place the home in his mother's name was not only relevant to the conduct element, but also to the willfulness element. Id. The court did not find credible the debtor's explanation that he arranged the transaction to keep the home from his wife in the divorce case, but instead found it "far more likely that the debtor decided to put the deed in his mother's name so that he could insulate the property from an IRS levy based on his tax liability." Id. at 588-89. The court in Volpe then turned to the debtor's expenditures for vacations and found that the debtor's decision to pay for those expenses was a "voluntary decision to spend the money on himself rather than pay his taxes." Id. at 589. Similarly, with no evidence to show that his children "had any particular need that could not be satisfied through public education," the court found that the debtor paid the tuition expenses voluntarily. Id. "The debtor's decision to spend his money on vacations and private school tuition weighs in favor of a finding that he willfully evaded his tax liability." Id. (citations omitted).

## The Debtor's conduct

The record at the trial overwhelmingly demonstrates that the Debtor engaged in conduct to evade or defeat the payment of her tax liabilities for the years 2004 through 2012 and 2014. The Debtor obtained extensions of time to file some returns, and filed other returns late. The Debtor did not pay her tax liabilities for 2004 through 2012 and 2014. Although the Debtor disagrees with the IRS as to the amount of her tax debt for those years, the Debtor's own schedules in her bankruptcy case list a total of $268,576.67 owing by the Debtor to the IRS without any portion of that amount listed as undisputed.

During the time that the Debtor incurred these tax liabilities, the Debtor enjoyed a lucrative medical practice that generated a substantial six-figure income each year, which she spent to provide a comfortable, in some instances even lavish, lifestyle for herself and her family. The Debtor took multiple family vacations and personal trips, and paid for numerous vehicles, many of which were luxury vehicles. More importantly, throughout the time that the Debtor was failing to pay substantial tax liabilities, the Debtor was paying enormous amounts — altogether over $325,000.00 — for private schooling for her two children, at the grade school, high school and college level. Payment of these non-essential items, while seeking extensions of the time to file tax returns, filing other returns late, and not paying tax

liabilities for years at a time, despite having substantial income, is sufficient conduct to meet the first requirement under Gardner to make her tax debt nondischargeable under § 523(a)(1)(C).

After filing her bankruptcy case, the Debtor engaged in even more overt, affirmative conduct to prevent the IRS from enforcing its lien against the Debtor's home on Dwight Street. The Debtor looked for and found a friendly buyer, SWEWAT, one of Barrow's clients, who would purchase her interest in the Dwight Street property and then rent the property back to her so that she and her family could continue to live there without interference by the IRS. The Debtor freely admits that she entered this transaction for the express purpose of preventing the IRS from selling the Debtor's interest in the home. The Debtor's assertion that she paid to the IRS all of the proceeds that she received from that sale — consisting of $42,937.00 — does not change the fact that the Debtor made the deal to block the IRS from enforcing its lien to collect payment of the Debtor's taxes. Instead of permitting the IRS to enforce its lien, market the home for sale to obtain the highest price for the home, and collect the highest amount of the Debtor's taxes, the Debtor wanted to control the sale of the home and unilaterally dictate to the IRS how much it would receive from the sale.

The IRS has met its burden to prove that the Debtor has engaged in conduct —
both prior to filing bankruptcy and continuing after filing bankruptcy — to evade or
defeat payment of her tax debt to the IRS.

The Debtor's mental state

Under <u>Gardner</u>, the mental state requirement of § 523(a)(1)(C) requires proof
that the debtor (1) had a duty to pay taxes; (2) knew she had a duty to pay taxes; and
(3) voluntarily and intentionally violated that duty.  The Debtor concedes that she
had a duty to pay taxes and that she knew she had a duty to pay taxes.  The Debtor's
defense in this adversary proceeding turns entirely on her contention that the IRS
failed to prove the third element:  that she willfully and intentionally violated that
duty.  Both the IRS and the Debtor agree that the Court must look to the totality of
circumstances to determine whether the Debtor willfully and intentionally violated
her duty.

Having considered the extensive evidentiary record in this case, the Court
finds that the totality of circumstances supports a finding that the Debtor did
willfully and intentionally violate her duty to pay taxes.

The Debtor had a lucrative medical practice with a substantial income
throughout all of the years that are the subject of this adversary proceeding.  During
those years the Debtor spent substantial amounts for personal, non-essential

- 29 -

expenses: private schools for her children; numerous vacations and trips; and expensive vehicles.[1] Those were all personal choices that the Debtor made rather than to pay her taxes. And throughout this time, the Debtor allowed Barrow to sign checks out of Harold PLC's Comerica Bank account, to pay his company and pay for other non-essential expenditures.

The fact that the Debtor was a dedicated, hard-working doctor who worked long hours during these years does not mean that her choices to pay for private schools, vacations and expensive vehicles were somehow not voluntary, conscious or intentional choices. The Debtor is a well-educated, intelligent, successful doctor whose decisions in all aspects of her life struck the Court as deliberate and well-informed. The Debtor credibly and thoughtfully explained why it was so important for her to provide a Catholic school education for her children, and why it was so important for her to pay for family vacations and other non-essential personal expenses. These were all voluntary, conscious and intentional choices.

That the Debtor chose to let her husband handle all of her tax matters was no less so. The Debtor explained that she delegated the handling of all of her tax matters

---

[1] The IRS also adduced evidence of other personal, non-essential expenses, but the Court need not mention every single one because they are not nearly as large as the specific expenses discussed by the Court and have only marginal, cumulative probative value.

- 30 -

to her husband because of his financial background and knowledge, fully aware that her husband had experienced his own tax problems with the IRS in the past. If anything, it seemed that the Debtor's knowledge of her husband's past difficulties with the IRS reinforced the Debtor's decision to delegate her tax matters to him. This was not a case of blind, uninformed trust in her husband, but an informed, conscious and intentional choice.

During the time that the Debtor chose to let Barrow handle all her tax matters, the record also shows that the Debtor was fully aware throughout these years that her taxes were delinquent. The Debtor gave a power of attorney to Lothamer in 2009 so that it could negotiate an installment agreement with the IRS regarding her delinquent taxes. Even though the Debtor maintains a belief that the IRS never formally terminated the installment agreement, the Debtor knew she was not keeping up with the installment agreement or paying her current taxes for the years after the installment agreement. The record demonstrates that the Debtor stressed over her tax problems, yet continued to make the voluntary choice to pay personal expenses for non-essential items for herself and her family to continue with the same comfortable lifestyle, with private schools, multiple vacations and trips, and expensive cars.

The evidence of the Debtor's pre-bankruptcy conduct over the years 2004 through 2014 is sufficient by itself for the Court to find that the Debtor's non-payment of taxes during those years was voluntary, conscious and intentional. But if there was any question at all as to whether the Debtor acted willfully to evade or defeat the payment of her tax debt, that question was answered resoundingly by the Debtor's post-bankruptcy conduct.[2]

The Debtor's sale of the Dwight Street property to SWEWAT was not an arm's-length sale. The Debtor did not hire a realtor. The Debtor did not market the property. The Debtor did not obtain an appraisal for the property. Instead, the Debtor and Barrow hand-picked Watkins, an old friend of Barrow, to purchase the Debtor's interest in the Dwight Street property for an agreed price high enough to enable the Debtor to make some payment to the IRS, but low enough for Watkins' company, SWEWAT, to make a profit. No other party was given an opportunity to purchase the home. This was not a sale intended to generate the highest value for the sale of the property to pay the Debtor's taxes. Instead, its mission was to prevent the IRS from taking control over the sale of the property and doing just that.

---

[2] A debtor's conduct after the tax debt was incurred is relevant to the debtor's state of mind in determining whether the debt is dischargeable. Meyers v. I.R.S. (In re Meyers), 196 F.3d 622, 625 (6th Cir. 1999).

The Debtor does not deny her purpose in making the sale, but seems to believe that the sale to SWEWAT should not be viewed as evading payment to the IRS because she did pay the IRS $42,937.00 of proceeds from the sale. But unilaterally dictating the amount of proceeds to be paid to the IRS out of a sale of real property by blocking enforcement of the IRS's lien on that real property is no less an evasion of payment then withdrawing some but not all the money from a bank account to limit the amount that the IRS can garnish from that account. In other words, that the Debtor's sale of Dwight Street to a friendly purchaser enabled her to pay some amount of her tax debt does not mean that the Debtor did not willfully evade the IRS from selling the property to get a higher price and a larger payment of taxes.

The Debtor's lack of transparency about the sale is also telling. The Debtor kept this sale to herself. Neither the Debtor nor SWEWAT recorded the SWEWAT Agreement. The Debtor did not tell either her attorneys in the adversary proceeding or in the District Court Lawsuit about the SWEWAT sale for months. The Debtor and her attorneys in the District Court Lawsuit attended a settlement conference with the IRS for the purpose of trying to resolve the District Court Lawsuit, yet even then the Debtor still made no mention of the SWEWAT Agreement. It was not until months later that the Debtor chose to reveal the sale, and only then because the

Debtor wanted to use that fact to defend the IRS's motion to appoint a receiver to sell the Dwight Street property.

The Debtor's conduct since the SWEWAT deal is also probative of her intent. The Debtor and her family continue to live in the Dwight Street property even now, with no credible evidence adduced at trial as to any actual rent payments to SWEWAT. The SWEWAT Agreement was an ill-conceived scheme to prevent the IRS from enforcing its lien against the Dwight Street property. The Debtor's own testimony establishes that her decision to enter this transaction, knowing full well that she had a duty to pay her taxes, was a willful and intentional violation of that duty. There is simply no innocent explanation for this transaction.

At trial and in her post-trial brief, the Debtor argued that her circumstances are similar to those of the debtor in <u>Storey</u>, where the Sixth Circuit reversed a finding that the debtor "had willfully attempted to evade paying taxes[.]" 640 F.3d at 741. There are some surface similarities. Like the Debtor, the debtor in <u>Storey</u> was a practicing physician. Like the Debtor, she filed federal income tax returns for ten years, all showing taxes due. Unlike the Debtor, who made some payments on past due taxes, the debtor in <u>Storey</u> made no payments. The <u>Storey</u> debtor also purchased real property during a time when she owed taxes. This was the only evidence of a voluntary and intentional violation of a duty to pay taxes. In ruling for the debtor,

- 34 -

the Storey court found no evidence that the home was "more lavish than [the debtor]'s previous residence or that the home was an unnecessary expense, purchased as an alternative to paying future tax obligations." Id. at 745. Likewise, there is no evidence before this Court comparing the Newport Street home to the Dwight Street home, from which the Court could find that the change represented a significant upgrade in housing.

But the inescapable difference is that the Storey court found no evidence of a lavish lifestyle or that the debtor chose to spend substantial sums on discretionary expenses, such as vacations, charity or private school tuition, instead of paying her taxes. Id. That's not what we have here. The Debtor spent hundreds of thousands of dollars on discretionary expenses instead of paying her taxes. The record is replete with large payments by the Debtor for private school tuition, vacations, vehicles and other non-essential discretionary personal expenses. Rather than the debtor in Storey, the Debtor has much more in common with the debtor in Volpe. 377 B.R. 579 (the debtor used a friendly party to purchase real property, from whom the debtor then rented, thereby evading the IRS's ability to recover from that property; the debtor lacked a credible excuse for the transaction; the debtor took multiple family vacations; and the debtor paid discretionary non-essential private school tuition for his children).

- 35 -

The IRS has met its burden to prove that the Debtor had a duty to pay taxes, knew she had such a duty, and voluntarily and intentionally violated that duty by paying for large non-essential discretionary expenses instead of her taxes.

## Conclusion

The extensive record before the Court shows that the Debtor has many admirable accomplishments and traits. And the IRS does not allege a fraudulent return or other fraudulent conduct by the Debtor.[3] But § 523(a)(1)(C) does not require a showing of fraud to make a tax debt nondischargeable. It requires only a finding that a debtor has willfully attempted in any manner to evade or defeat a tax. By her voluntary, conscious and intentional choices to pay enormous amounts of non-discretionary expenses — all the while knowing she was not paying her taxes — and by arranging the SWEWAT sale to try to end run the IRS, the Debtor willfully attempted to evade and defeat payment of her tax debt to the IRS. For the reasons explained in this opinion, the Court holds that the Debtor's tax debt to the IRS for

---

[3] The IRS did adduce evidence showing that the Debtor paid her personal expenses out of bank accounts in the name of Harold PLC rather than in her own name. The IRS did not argue that this conduct evidenced fraud by the Debtor but that the nature and amount of the expenses that were paid out of the Harold PLLC's accounts were probative of the Debtor's voluntary, conscious and intentional choices to pay non-essential discretionary personal expenses rather than pay her taxes. That is how the Court evaluated that evidence, and gave it some weight in making its findings regarding the Debtor's mental state. But the Court did not find that this conduct tended to show fraud by the Debtor.

- 36 -

the years 2004 through 2012 and 2014 is nondischargeable under § 523(a)(1)(C).

The Court will enter a separate order consistent with this opinion.

**Signed on February 12, 2020**



/s/ **Phillip J. Shefferly**

**Phillip J. Shefferly**
**United States Bankruptcy Judge**